By the Court—Woodruff, J.
The testimony of James Bunten, Jr., given on the trial, was to the effect that at ór about the 1st of October, 1855, he applied to the agent of the defendants, in Quebec, for insurance on a cargo of lumber in process of being laden on board the barque Azoff. That the agent gave him a tariff of rates of premium varying Avith the days named therein for the sailing of vessels, doivn to the tenth of November, and said that the premium of insurance would be according to *452 those rates. That he then agreed to the insurance at those rates, and the agent told him to consider the cargo insured, provided the vessel sailed before the tenth of November. That the amount insured, as then agreed, was the invoice cost of the cargo, increased by the addition of ten per cent, but that the actual amount or sum could not be ascertained until the lading was completed. That the day of sailing could not then be fixed, and the agent agreed that the premium should be fixed according to the tariff which the agent handed to him. That in the agreement there was no warranty as to the day of sailing, though the witness understood at the time that the agent could not take a risk on a vessel to sail after the tenth of November. And with that qualification the agreement was that he should pay the premium which was chargeable according to the tariff, and according to the time the vessel actually sailed or proceeded to sea.
If such an agreement as this was made by the agent of the defendants, and he had authority to make such an agreement, I perceive no ground upon which the defendants can refuse to perform it.
That this agreement was made was testified in unqualified terms, and the agreement is one which disposed of every material particular, and enabled the parties to say, the moment the lading was completed, to what amount and upon what terms the plaintiff was insured, and, even while the day of sailing remained undetermined, the scale of prices furnished the certain and precise test of the amount of premium so soon as the day of actual sailing should be known. Here are all the elements of a valid, binding agreement, certainty in its provisions, consideration and mutual assent.
That this agreement was made is also testified by McLirnont, the defendants’ witness, their agent in the transaction. He says the insurance was agreed to, that the only condition was that the vessel should sail on or before the tenth of November following. That the rate of premium was not absolutely fixed, but that it was to be in accord *453 anee with the tariff of rates which he produced on his examination, and was to depend on the day of the sailing of the vessel. That if she sailed on or before the tenth of October, the rate was to be three per cent, if after that date and before the tenth of November, the rate was to be higher aud in accordance with such tariff. That the day of sailing of the vessel was not fixed by the contract, except that it should not be later than the tenth of November. And the precise amount or valuation of the cargo was not fixed, because the agent of the plaintiff had not received his invoice of the cost and could not ascertain such cost until the time when, her lading being completed, the vessel should sail.
Here is the testimony of the plaintiff’s agent and of the defendants’ agent and witness, and to the same purport, in respect to this agreement; and to this testimony there is no contradiction.
To my mind it establishes a valid binding agreement, under which the defendants became bound to execute a policy, insuring the plaintiff to the amount of his invoice cost with the ten per cent addition, and by which the plaintiff was bound to pay to them such premium as according to the tariff of rates above referred to was chargeable according to the time when the vessel should sail, provided, however, the agent of the defendants had authority to take a risk for them upon those terms.
The only apparent discrepancy between these witnesses in relation to these interviews is, that Bunten, the plaintiff’s agent and witness says, that McLimont, the defendants’ agent, gave him the tariff of rates, while McLimont says he did not exhibit to Bunten the list or tariff of rates of premium, but informed him what the rate of premium would be. This discrepancy is of little moment—it still leaves the important fact that the rates were communicated and agreed to, and. whether it was done orally or by showing the paper on which the tariff was written, is of no moment—it is a particular in respect to which either of those two witnesses might be mistaken, without weak- *454 erring’ the force of their united, testimony to the agreement itself, including all its essential details and particulars, and McLimont furnishes in his testimony the means of making the contract definite as to premium, by annexing to his deposition the tariff referred to, which he says was approved by the defendants, according to which vessels sailing between the 1st and 10th of October inclusive, were to be charged three per cent premium, and vessels sailing between the 10th and 20th inclusive, were to be charged four per cent premium, and the rates increased thereafter for successive periods to and including the 10th of Hovember.
How, that the defendants’ agent had authority to bind the defendants as insurers upon risks like that offered to him by the plaintiff, cannot be denied. The letter of authority under which he acted, dated Dec. 14th, 1854, after stating the commissions to be allowed to him, and the reliance of the defendants upon his caution and discretion in the risks he should take, declares as follows : “We agree to your taking risks for us to the following extent;” * * * “3d, upon cargoes of lumber, Quebec to Great Britain and continent of Europe, in good vessels ranking not lower than A. 2, and avoiding such new vessels as are on their first trip or slightly put together, not more than $5,000 by each, with a discretion of going as-far as $7,500, on such as you consider more than ordinarily desirable,” and, after mentioning other risks he might take, the letter adds, “We approve the tariff of rates you have presented us as applicable to the several classes of risks # * * reserving our right of making such modifications as we may deem necessary.”
It is not claimed that the risk taken by the agent upon the lumber for the Azoff was not a proper risk to be taken under this letter of authority; and if so, then the utmost that the defendants can claim is, that their agent must, in fixing the premium for the risks he took, conform to the tariff referred to in the letter, or to such modifications as the Company might afterwards make. Even this is *455 asking a great deal. What that tariff was does not appear in the case, and it did not appear in the defendants’ letter of authority, and it is not easy to see how, when the defendants had given to their agent the very large discretion which the terms of their letter import, they could have expected him to secure to them any business whatever, where the security of customers would depend upon his conforming, in respect to rates of premium, to an arrangement between the Company and him, which was not disclosed in the letter of authority, but was contained in a letter held by the Company, the customers having no means of information except perhaps the assurance of the agent himself, which alone would be insufficient to prove his authority, if proof should be necessary. It would be no violent construction to say that the letter contained a general authority to take risks of the classes designated, the concluding paragraph being merely an intimation that the Company approved the rates of premium which he, in his confidential correspondence with the Company, (which it was not designed to communicate to the customers,) had suggested. But whether the reference here made to the rates of premium be or be not regarded as a limitation of McLimont’s authority, does not, I think, affect this case in the view of the evidence above suggested.
The agreement was that the rate of premium should be paid according to the tariff of premiums, which one witness says was exhibited or given to him, and the other says was verbally stated. And this tariff is stated by the defendants’ witness, and argued strenuously by the defendants’ Counsel, to have been the exhibit B contained in the case from which the rates in the case are transcribed. And this tariff was according to the last instructions of the Company.
In this connection, however, and in reference to the construction of the authority given McLimont, and as tending to show that it was never designed to regard the rates of premiums as entering into any limitation or condition of his authority to take risks, but only as matters *456 of private and confidential communication between Mm and them; it is pertinent to observe, that after the original letter of authority was given to McLimont, dated Dec. 14, 1854, and in which the rates of premium referred to are declared to have been presented by him, every subsequent change in the rates, and there were several, was made, not by instructions of the company originating’ with them, but on the suggestion and recommendation of Mc-Limont himself, in 1ns correspondence with them, assented to by them in reply. It is scarcely possible that the defendants for a moment supposed that McLimont would or could do any business for them if the applicants for insurance were bound to know the contents of all the correspondence between him and the company. For, although the assured would be sufficiently protected when he had actually received a policy in hand, executed by the defendants, yet the instances must be numerous in which it was important that parties should be insured from the date on wMch their application was assented to, without waiting for the receipt of a policy from New York.
The result of these observations is according to the uncontradicted testimony of the witnesses, a distinct agreement, within the authority of the defendant’s agent, for the insurance of the plaintiff at a rate of premium wMch the company had actually approved, and dependent only, by the very terms of the agreement, on the day on which the Azoff should actually sail.
If the agent had suffered the matter to rest in that stage until the day of sailing was known, or if he had sent for a policy which was in terms like the agreement, valuing the property at invoice cost and ten per cent added thereto, and for the rate of premium referring to the tariff, no question would, I presume, have arisen between the parties.
But Bunten, when he originally applied for the insurance, expressed the expectation that the vessel would sail as soon as the 10th of October, and the hope that she would get off sooner even than that.
And McLimont unfortunately in writing for the policy *457 made quite specific the statement that she was to sail by the 10th, when in truth, as he himself now admits and testifies, that was a mere expectation and not a warranty, nor a condition of the agreement to insure, and when in truth he did not send for the policy till the 16th, and knew at the time that the vessel had not sailed on the 10th of October. And when after the receipt of the policy from Yew York, his attention was called to the mistake he had obviously made in the day of sailing, he not only exhibited his own consciousness, that in sending on the 16th October for the policy, with full knowledge received on the 11th, that the vessel had not sailed on the 10th, and would sail on or before the 15th, and in fact knowing’ that she had sailed on or before the 15th, he had made a mistake in his advices to the Company, but he showed his own conviction that he had bound the Company by his agreement with Bunten, which was in entire conformity with his powers, by making an alteration in the policy itself, so as to conform to that agreement in respect to the day of sailing, by naming the actual sailing day. But here again he blundered, not only in assuming to alter a policy without authority, but in overlooking the fact that the policy mentioned three per cent as the premium. And again when notified on the 11th, that the vessel had not sailed, he informed Bunten that the rate of premium would be 3J per cent, according to a former tariff of rates, losing sight of the amended scale of tariffs above referred to, by which the rate named after the 10th, to and including the 20th is 4 per cent, and thereafter Bunten paid him three and one-half per cent, that being all that McLimont desired him to pay. Yow if it be conceded that McLimont had no authority to insure the plaintiff at a less rate than 4 per cent, a valid binding agi’eement was made, because the plaintiff agreed to pay according to the tariff which prescribed 4 per cent for such a risk. And although mistakes were afterwards made, the plaintiff is responsible for no one of them. He made a distinct agreement; he was ready to pay afterwards, and did pay all that McLimont required. *458 And if McLimont had no discretion to insure for or accept any less than the tariff rates, then McLimont’s taking 3£ per cent, whether in the exercise of a supposed discretion or by overlooking, as he says, at the moment the amended tariff, would not bind the defendants nor prevent their collecting the balance. Neither would such mistake invalidate the previous agreement nor relieve them from their obligation to give to the plaintiff such a policy as McLimont had agreed to, and at a rate of premium conforming to the tariff of rates to which the Company had assented, and Bunten had agreed.
I think, therefore, that the plaintiff was entitled to the relief which he sought in his complaint, in every respect but one, the premium to be allowed to the Company was four per cent instead of three and one-half, and in that particular I think the findings of fact and conclusions of law inaccurate.
The view thus taken renders the exceptions taken by the defendants on the trial, of no importance. The testimony rejected, if indeed any testimony was rejected which could, in any aspect, be material, could not affect the result above stated, because I have assumed the authority of the defendants’ agent to be just what they claim and desired and attempted to prove it to be, and all the testimony rejected was offered with a view to that precise point, viz., McLimont’s authority; except, perhaps, the question when McLimont returned or made known to the Company the premium he had received on the risk, which the defendants’ Counsel insisted upon to rebut the presumption of laches. As no question of laches was raised on the trial, and the decision, neither at Special Term nor here, proceeds upon any such idea, the question was wholly immaterial, and in no other aspect could any delay of their own agent in accounting for the premium received, affect the plaintiff. As to the letters at one stage of the trial apparently rejected, they all appear to have been, in fact, read in evidence in some stage of the trial. But whether so or not, their bearing on the question, what was the rate of pre *459 miums approved by the Company, and what was McLimont’s authority, ceases to be important, when all that the defendants claim is conceded in this respect, aud still they are held bound by the agreement, according to the views above expressed.
As already suggested, the mistakes in the preparation of a policy in which the terms “ warranted to sail October 10tli, 1855,” were inserted, and the premium stated to be “three per cent,” and the subsequent error in collecting only three and one-half per cent, were committed by McLimont, the defendants! agent, and did not impair the obligation of the defendants to issue a policy according to the actual agreement.
That agreement bound them as insurers of the cargo of the vessel, which actually sailed October 15th, 1855, at the rate of premium fixed in the then existing tariff for a vessel sailing on any day between the 10th and 20th, viz., four per cent. It would have bound them, had she sailed on a later day before November 10th, the rate of premium being in such case greater according to such tariff"; but as she actually sailed, and was represented by Bunten to have sailed October 15th, 1855, that is the proper day to have been named in such policy as the day of sailing.
The defendants are, therefore, to be regarded as having insured the plaintiff to the amount of the invoice cost of the cargo, with ten per cent added thereto, (which was $4,510,) with a warranty that the vessel should sail October 15, 1855, and at a premium of four per cent.
The loss, as settled by the written stipulation of the parties, after deducting from the valuation the small sum received by the plaintiff for proceeds of the sale of a portion of the cargo saved from the wreck, was $4,317.22, for which the defendants are liable to the plaintiff; but as by reason of the mistake abovementioned there still remains due to the defendants, one-half of one per cent on the valuation for premium in part unpaid, that is to be allowed to them in abatement from the loss, that is to say, one-half of one per cent on $4,510= $22.55, which being *460 deducted from $4,317.22, leaves $4,294.67 as the actual amount payable according to the terms of the insurance.
It is found that the proofs of loss and of the plaintiff’s interest, (admitted by stipulation to have been duly furnished,) were presented to the defendants on the third day of December, 1855, and the loss was payable thirty days thereafter. The sum due, therefore, bears interest from the 2d day of January, 1856, which interest, at the date of the judgment, December 19th, 1860, was $1,492.28, and this being added to the principal makes $5,786.95, which the plaintiff was entitled to recover with his costs.
In preparing the finding of facts and conclusions of law, the Counsel must have inadvertently overlooked the fact that four per cent was the premium for a vessel sailing on the 15th of October, and, also, that if the warranty was extended to ¡November 10th, the premium would be eight per cent, and on settling the finding, as inserted in the case, this was not observed by the Judge at Special Term. The effect, however, was only to give to the plaintiff, by computation, a greater sum than he was entitled to; in other respects, the rights and liabilities of the parties were rightly determined.
The judgment, if permitted to stand, must be corrected in some of its terms. The plaintiff has recovered too much. The reduction to the proper amount can probably be only made by his consent. The defendants will not be prejudiced by the reduction of the amount of the recovery.
This being an action which would have been formerly called a suit in equity, in which the ultimate and final relief to which the plaintiff is entitled, viz.: recovery of the amount of his loss, could be-awarded to him, it was hardly necessary that the form of executing a policy should be required, but no objection is raised here by the appellants, on that ground. Becovery of the amount due is the substantial relief which satisfies all of the plaintiff’s demand.
¡Neither was it necessary to recite in the judgment the particulars of the decision; it is sufficient to refer to it, *461 and as the errors above alluded to are reiterated in the recital, it should be struck out.
If the plaintiff files . his consent, that the judgment entered herein be corrected by striking from the recital therein the words “ said decision containing,” and onward to and including the words “ costs of this action ;” also by striking out of the adjudication the words “November 10th, 1855,” and inserting instead thereof the words “October 15th, 1855;” and striking out the words “ three and one-half per cent,” and inserting instead thereof the words “four per cent;” and also by reducing the amount adjudged to the plaintiff therein, by striking out the words “five thousand eight hundred and forty-one dollars and sixty-seven cents,” and inserting instead thereof “ five thousand seven hundred and eighty-six dollars and ninety-five centsand striking out the words “ sixty-three hundred and forty-two dollars and twenty-eight cents,” and inserting instead thereof “six thousand two hundred and eighty-seven dollars and fifty-six cents,” the judgment as thus modified is affirmed without costs to either party on the appeal. If the plaintiff do not give such consent, the judgment is reversed and a new trial ordered, costs to abide the event.